The next case is Russell v. New York University. Good morning, your honors. Christopher Berlingeri of Berlingeri Law, PLLC, for the Plaintiff Appellant, Dr. Susan Russell. May it please the Court. The District Court below improperly granted summary judgment with respect to Dr. Russell's hostile work environment claims because it found that Dr. Russell had not raised issues of fact as to the negligence of the response and adequacy of the response and investigation. With respect to Dr. Russell's Title VII retaliation claims, Dr. Russell did not waive any claims of retaliation at the District Court level, and there were issues of fact as to pretext. And on a third note, this Court recently came out with a decision in Zarda v. Altitude Express which recognized sexual orientation discrimination under Title VII. The lower court was bound to Christensen and could not consider any allegations of sexual orientation for purposes of Title VII, and we respectfully ask this Court to remand on that basis. But with respect to the hostile work environment claims, an employer who has notice of a hostile work environment has a duty to take reasonable steps to eliminate it. That's what this Court said. What would you have wanted NYU reasonably to do in the light of all the things they did and in the light of what your client, perhaps quite understandably, didn't want to give them because there was the investigation going on with the DA? I mean, what is it that they should have done other than what they did? They heard about it, they started investigation, they started protective things. At one point, without evidence, because your client, understandably perhaps, didn't let them have it, said, as of this time, we can't go forward, but we might go forward in the future. What more do you want? Well, yes, Judge Calabresi. One of the things that NYU could have easily done, which was cost-effective and within their control, as required by this Court in Snell v. Suffolk County, was to simply ask the defendant of Hallease, Tometz, and Meltzer for their IP addresses, their internet protocol addresses, as compared to the ones that have been supplied by Dr. Russell through her investigation, and it would have been a cost-effective and remedial measure to simply ask. But you are asking somebody, because someone says, I suspect A and B, and at that point gives no evidence, because she won't give the evidence that is at the DA, that A and B are in fact involved, to do more than try to find out if they are involved and start doing things which, if they are not involved, which is possible, it turned out here that they were, or that Tometz at least was, but if they're not involved, is an infringement on their privacy. So, I mean, frankly, I see more about the retaliation. I see some possibilities there. But I have trouble with what reasonably you can ask an employer who has done this much to do in a case on the basis of what the data that your client was willing to let them have. So to answer that question, in 2013, at the end of 2013, in December, the OEO, the Office of Equal Opportunity, was basically in full bore with their investigation, and we concede that, that at that point there was a strong investigation. So after their break in 2014, the winter break, they come back, and the OEO interviews Tometz and Meltzer, and they could have simply asked at that time what their IP addresses were. That would have been a simple question because at that point the DA had already, the New York District Attorney's Office had already indicated that at a very minimum they had spoken to Meltzer, and that's Professor Tometz's wife. So at that point they could have just simply asked, what's your IP address compared to the two that Dr. Russell had provided, one for residence, which was in East Hampton, which was a summer home, which according to the deposition of Tometz years later, he said, he did in fact send random free stuff to imitate the effects of an unregulated listserv or a message board, to exact revenge. You don't have too much time. Could you address the retaliation and specifically the question of whether the warning that was then withdrawn amounts to adverse action and whether the later thing, there's this question of causation on which the district court went. Could you address those questions? Yes, Your Honor. In terms of, so the district court in our view improperly found that we waived, that Dr. Russell waived her argument for this 2014 final written warning because on summary judgment, Plaintiff Appellant's former counsel did not directly rebut in his opposition papers that that was waived. So in the main brief, we argue essentially that at all times throughout the proceedings, there was six acts of retaliation. Even Judge Woods in his district court opinion at page 59 cites this particular act in question, this retaliatory final written warning as a retaliatory act. So we're essentially saying that she, Dr. Russell complained about a co-worker's misconduct. That misconduct had to do with one of her protected class bases, primarily her sexual orientation. And then she essentially was written up with a final written warning. They didn't, NYU did not employ its progressive discipline on her. And wasn't the warning converted to a verbal warning in January? That's right, Your Honor. It was converted. And the verbal warning was not issued. It wasn't issued, Your Honor. However, it was sent in our view as a deterrent to say, if you are going to complain, you're going to arbitrate these things through the union. We're going to give you a final written warning. Oh, now we'll change it. So the fact that it eventually was changed and not really incorporated into her disciplinary record is not dispositive of the fact that it was retaliatory. So our position would be to that is that, number one, it wasn't waived. Because Judge Woods even incites it at page 59 of the decision that it could have been one of the retaliatory acts. As to answering it directly in the opposition papers, I was not plaintiff appellant's counsel. She actually changed counsel during the briefing here. And I submitted the reply brief, notwithstanding that. But we raised it again, and we raised it in our main brief. And that could be found as retaliation. As to, I think, your second question, as to pretext, as to whether or not there was tribal issue of fact, as to pretext, as to the termination, Dr. Russell was fired during the pendency of this action. She filed this action in 20- Well, but you don't raise that until just now. What you said at the time was that this was retaliation for some actions which took place six months before and some actions which took place two years before and three years before. Let's just take the six months. By itself, that we have often held is not enough. You have something more here, and that is the fact that the arbitrators found that the punishment was too severe. And the question that I have is whether if you put together six months plus the fact that the arbitrators found that the action taken was too severe, whether that is enough to say causation. That's where the fact that later you make another argument about why it was causation. That isn't in the complaint. It just ain't there. Yes, to your Honor's point, we would agree that the six months, that temporal proximity, coupled with the fact that the arbitrator found that the so-called crime didn't fit the punishment, the arbitrator's exact words was that the misconduct did not rise to the severity. How does that cause us to think retaliation other than simply that they didn't like this person, which is perfectly obvious that they didn't like this person, but not liking a person is not a Title VII. Not liking a person is a state action, a state cause of action. That's correct. Why don't we look at that just as the arbitrator and the employer disagreed about what an appropriate punishment would be for violation of the protective order? Yes, and the legitimate issue is clear. I would point this Court to its decision in Espinal v. Gord where essentially the passage of six months, the same sort of issue here, where Espinal, who was a prison guard, I believe, or an officer, they waited to exact revenge on Espinal. And what we're saying here, too, is that NYU waited for this sort of opportune moment. There were three benign emails that Dr. Russell sent to a co-worker complaining essentially about her protected class, mainly her Judaism. She also CC'd Dean Schwartzbeck, this is the NYU Liberal Studies Dean, on that email and confronted her. So for those three emails, directly after the mediation at the Southern District, she was terminated. So in terms of we were saying, to answer your question, again, Judge Calabresi, I'm sorry if I didn't address it right away, was we think that they waited for this sort of opportune moment, similar to an Espinal, where it was like, all right, we got you. Now you're fired for this. And probative of the pretext would be the arbitrator's decision. Obviously it's not binding on this Court, but it would be, at least in our opinion, it would be evidence of pretext. Is what you are arguing that one of the reasons they disliked her was the fact that she had brought these suits? And that that is why the punishment was more severe? Yes, Your Honor. And that would be the argument. Coupled with the fact, too, that they did not essentially, NYU did not follow, not that there's precedent holding it, but it's definitely probative of the fact that they didn't follow their progressive disciplinary, where the arbitrator found that a warning probably would have sufficed, or even at most a suspension. But to terminate her? The arbitrator found that this was a serious violation. And it clearly was a serious violation. And it was akin to violations of a sort that she had done before, because she had, in the first thing, she had continued to send nasty things to this administrative assistant after she'd been told she shouldn't. And here she was sending things to Baumann after, in violation of a confidentiality agreement, in violation. So, you know, there were plenty of reasons that they had, whether that is enough or whether it was also linked to her bringing the suit is the question. Yes, I see. I see that this court is bound to Nassar in the sense that it needs to be but for causation. So we find that the evidence presented so far, we could find a tribal issue of fact as to the pretext. I mean, besides having three e-mails for essentially sticking up for herself, and the district court never ruled, this is to your point, the district court never ruled whether or not she violated the order. And the district court never ruled also whether or not violating that order was a legitimate reason for the termination. And just returning to, just for a moment, to the reasonableness of the NYU investigation, today you focused on the period where OEO interviews the perpetrator, the person who'd been harassing her, and NYU should have asked at that point for the IP address. They had enough information from the DA's office, they should have made further inquiry. Is there anything else you want us to consider in terms of deficiencies in NYU's investigation? Yes. The fact that, and this is a stark one, the fact that they never updated the report. So the OEO report issued by, his name is Jolly, this Jolly report said at the last page that they will update the report when information becomes relevant or able to be presented. Two years after the report was issued in 2014, Tometz, the perpetrator, he admitted that he sent these random free things. So at a very minimum, they could have updated the report just to kind of close the loop on this issue. They didn't have to update the report, but we, in our opinion, it would be a reasonable thing to do, and that their response wasn't fully adequate. How would that have benefited your client? I mean, by then, Tometz had admitted all sorts of things had happened. The report was issued at the time. I mean, you know, one might say, yeah, update it, but how is your client affected by that? How does that make NYU responsible for the hostile environment, that the environment was hostile? There's no doubt. I mean, her treatment was terrible, but how does a failure to update the report affect NYU's responsibility for it? Well, I mean, this is somewhat of a policy argument, but it goes against the spirit of the law in the sense that Title VII under the Shell EEOC case and also this court in Deutch v. Jack Hubeck essentially says that once an employer has notice of a hostile work environment, they have to take reasonable steps to eliminate it. Yeah, okay. So let's just take a hypothetical. There is a hostile work environment. At the time, the employer does everything there can be to investigate it. Later on, some piece of datum about the hostile environment comes up. Are you saying that we should hold that in a situation like that where the employer does not at that later point modify all the earlier findings which were correct or not improper as it was, they will be held responsible for the whole work environment? That would be a mighty broad holding. It would be a deviation from what's held now. However, one of the evidence of negligence here is that NYU said they would update the report. So they're violating their own policies in not doing so. So in your hypothetical, I'm not sure if they said that they would update it. So among other things, I will reserve some time for rebuttal.  Good morning. Good morning, Your Honors. My name is Margaret Watson, and I, along with the law firm McElroy, Deutsch, Mulvaney, and Carpenter represent the individual defendants, appellees, Joseph Tomitz, and Eve Meltzer. I will be extraordinarily brief. The only reason I am here is to, as set forth in our brief, to protect the record. As is clear from the court's opinion below, the court declined to exercise supplemental jurisdiction over the state and city law claims, which are the only claims for which my clients have any potential liability. I was prepared this morning to rebut any misstatements of fact made by plaintiff in his recitation of the record, and I see no need to do that. So I will delegate, with the court's permission, my time to counsel for NYU, Mr. O'Keefe. Thank you. May it please the court. My name is Joseph O'Keefe, with Proskauer Rose, LLP, and I represent New York University and Robert Scalacci in this appeal. As a preliminary matter, I want to address several of the points that were raised by the appellant in their reply brief, several of them raised for the first time. As this court has repeatedly held, it's not appropriate to raise arguments for the first time in reply, and those arguments should not be considered. In the preliminary statement, appellant argues for the first time in reply that the district court erred by finding that Dr. Russell's claims for religious discrimination failed as a matter of law and fact because Tometz was Jewish, despite Tometz admitting to being raised Catholic, and he never actually converted to Judaism. He argued this for the first time, but more importantly than that, the argument mischaracterizes the district court's holding. The district court never made any finding based upon any, with respect to Mr. Tometz's religion. The statements about Tometz's being raised Catholic were in the statement of facts. As noted in footnote 11 of the district court's opinion, the court never reached the first prong of Russell's hostile work environment claim, and as the court stated, in declining to address the first prong of Dr. Russell's hostile work environment claim, the court takes no position concerning the nexus between the complaint of conduct and any of Dr. Russell's protected characteristics. That same point is worth emphasizing with respect to the reference in the reply and the reference here this morning in oral argument to this circuit's recent decision in Zarda, which expanded Title VII to cover sex discrimination to include protection for sexual orientation. The argument based on Zarda is nothing more than a red herring here because, again, the district court's decision on hostile work environment claim was based only on the second prong, the basis for imputing liability, and the court took- But that's an easy point. If we were to agree with opposing counsel that there was error with respect to that as to the four or five areas that she mentioned, then she could go back, and when she goes back, she could also raise Zarda again. If there is nothing on the first four or five, there's no reason to think that there's anything on Zarda. That's a waste of time. Thank you, Your Honor. I want to turn to the retaliation claim since the court focused upon that during appellant's argument. With regard to the retaliation claim, there are two important points here. First, with respect to the final warning letter, as we set forth in our brief, but which was not considered by the district court below, based upon authority in this circuit, a warning letter or a disciplinary letter is not an act- The authority in this circuit on what constitutes an adverse action is very close. There are cases that say where something is withdrawn, it doesn't amount to adverse action. There are other cases that say that where it stays long enough and has consequences, it does. So that's a tough question, frankly. The question of whether it is really before us or whether it was waived as the district court may be a different way of dealing with. But the question of what is adverse is anything but easy. Well, with regard to that point, Your Honor, there's two responses that I would have. First of all, we're not resting solely upon the fact that the warning was withdrawn. The authority suggests that disciplinary actions and warnings don't qualify as adverse employment actions for purposes of a retaliation claim because there is no adverse employment action that ultimately flows from that. It would be the subsequent termination that would be the adverse employment action. But perhaps more importantly here, the acts which gave rise to that final warning occurred several years- Your Honor, the Supreme Court has told us that if a person would be chilled from doing something on account of what was done, that suffices to be an adverse action. And the Supreme Court has recently quite strongly come out that way. So that's the standard we have to look at. And there's no evidence in this record that there was any chilling effect flowing from that warning record. In fact, the evidence to this record is quite to the contrary. On multiple occasions following receipt of- following that final warning- There's no doubt that this particular plaintiff wouldn't be chilled by anything. By anything. But that isn't the test either. What about the plaintiff's other theory? There's a temporal proximity with regard to the other theory of retaliation. And here the arbitrator made a determination that the punishment didn't fit the crime. Maybe thin, but taking them both together. Why isn't that enough to get- Sure. Well, first of all, the record is clear that the complaints that ultimately- that she cites in support of her retaliation claim. First, the complaint to the DA's office. Second, the EEOC filing. Third, the filing of this lawsuit are in long temporal proximity before the decisions to terminate. One of them two years before. The second, one year before. The third, six months before. So the temporal proximity is beyond the typical two to four months that has been cited in this circuit as giving rise to some sort of inference of a retaliatory act. In addition, with respect to the arbitrator's findings, the arbitrator made no findings whatsoever with respect to whatever motives may have prompted NYU to take its action. To the contrary, it found that she, in fact, engaged in conduct which, quite frankly, is serious misconduct. In this circumstance, she sent e-mails to a potential witness in this case, essentially daring her to step forward to be a witness in this case. Something which not only . . . Let's go back to what I said to opposing counsel. Is it not a possible inference that they disliked her in part because she was bringing these suits? And on the basis of that, they gave her a punishment which was more severe than that was warranted. And the other argument is Nover was just a disagreement on punishment. But the question is, is that enough to raise a question of fact? Judge Calabresi, I would submit that it is not. Because there is nothing in this record to suggest that that was one of the reasons which ultimately motivated NYU to make the termination decision. And again, the record stands in stark contrast with that reality because you have a person who complained about these things on multiple occasions in a period spanning two years. And NYU never took such action. It only took such action after she engaged in serious misconduct, which NYU viewed as tantamount to witness tampering in connection with a potential witness in this case. In which the arbitrator recognized a serious misconduct. That the arbitrator recognized a serious misconduct. Your argument is along the lines that even if one could imagine that adverse actions are taken with a retaliatory motive because of some complaints that if they are so clearly merited, the clarity of the merit of the actions taken should overcome the possibility that they might have been based on a retaliatory motivation? Absolutely, subject to the caveat. That's one of the problems with retaliation as opposed to other types of discrimination claims. There are so many reasons, there are an infinite number of reasons why an employer can behave in an adverse fashion towards an employee. And in order to establish a discrimination claim based on race or national origin or religion or whatever it is, there has to be evidence that that is the motivating factor. But once as to retaliation, once the plaintiff has made some kind of a complaint or done something, then anything that happens thereafter can be labeled as retaliation. See, I complained and then they did this to me, they did that to me, they disciplined me, they warned me, they eventually fired me. It all can be retaliatory and it's true that conceivably it can. But if there is clear merit, if there is clear justification for other reasons for the things that were done, it makes a difficult question. And any other conclusion, Your Honor, would tie an employer's hands once an employee submitted complaints like this particular case? That's why in this case there is a problem if we read the arbitrators in a particular way because one could read the arbitrators as saying, no, there wasn't sufficient merit. That is, there was merit to do X, but not X squared. Now, I'm not sure that I would read the arbitrators that way, but that would be the answer to what Justice LaValle said, that if there is an arbitrator's finding that the merits are not there, then the argument, oh, well, there were merits, may go. I'm not sure one could do it in the facts of this case. If I might respond to that, I mean, the arbitrator sits in a fundamentally different position than the district court. It is the arbitrator's job to assess, based upon precedent and agreements between the teaching staff at NYU, whether a particular conduct justifies termination in those circumstances. Whereas in this court, under Title VII and the law that we seek to apply here, the authority is legion stating that the courts should not step in as some super personnel agency and second-guess the decisions of employers. So you are saying the decision of the employer to discipline her was clearly justified, and the question of whether the discipline should be at this level or at a slightly higher level is precisely the second-guessing, which we are not permitted to make, although an arbitrator may make it under the contract. Absolutely. The arbitrator is permitted to engage in that second-guessing exercise, whereas the authority that governs this court suggests that this court should not. And for those reasons, we respectfully submit that the district court's opinion should be affirmed in its entirety. Thank you. In rebuttal, picking up, excuse me, as the super personnel decision, I guess that's the Bernie versus Cromwell case. We're not asking this court to second-guess it. Either if the decision to discipline was termination or if it was, let's say, suspension, in our view it would still be retaliatory, notwithstanding the fact that it's severity of the discipline. So what we're looking at is that adverse action, and that's what the statute requires in the case as a whole, that it's adverse action, not necessarily termination or suspension, but under the facts still within six months, and to the point, and I have to make this. Your argument isn't that, because your argument with the implication of it would seem to be after the employee engaged in what the arbitrator agreed was serious misconduct, the employer couldn't do anything because a reasonable jury could, at least if it wanted to avoid a jury trial, because a reasonable jury could find retaliation. Well, they could do something. They could find her, let's say, lesser discipline, if she was disciplined to a lesser extent.  But to the point of six months not being too attenuated, this court has held in Grant versus Bethlehem Steel that eight months was sufficient between protected activity and adverse action. And coupled with the fact that we need to show pretext, we believe that we raised issues of pretext, that weaknesses and implausibilities of the employer's proffered reason for the legitimately non-retaliatory action. We find that, essentially, their reason for disciplining her was pretextual to her complaint. She complained a lot. She complained often. She also didn't settle at the... That, again, you didn't put in your complaint that the failure to settle was a grounds for retaliation. That would have been very close, but you didn't claim that that was a ground for retaliation, and it's too late for you to raise it now. Okay, Your Honor. We'll concede that point. If there's no other questions, we will... Thank you all. We'll take it under advisement. Nicely, nicely argued. Thank you.